OPINION
{¶ 1} Appellants Mary and Allah Bennett appeal from the November 22, 2006, Judgment Entry of the Stark County Court of Common Pleas, Juvenile Division, granting permanent custody of their minor children to appellee Stark County Department of Job and Family Services.
 STATEMENT OF THE FACTS AND CASE {¶ 2} Maria Bennett (DOB 3/2/92), Gabriella Bennett (DOB 7/7/94) and Josiah Bennett (DOB 7/19/95) are the biological children of appellants Mary and Allah Bennett.
 {¶ 3} On June 17, 2004, appellee Stark County Department of Job and Family Services (SCDJFS) filed a complaint in the Stark County Court of Common Pleas, Juvenile Division, alleging that the three children were dependent and neglected. An emergency shelter care hearing was held on June 18, 2004. At the hearing, the trial court ordered the children to be placed in the emergency temporary custody of appellee SCDJFS.
 {¶ 4} A first amended complaint was filed on July 20, 2004. A second amended complaint was filed on August 12, 2004.
 {¶ 5} As memorialized in a Judgment Entry filed on September 7, 2004, appellant Mary Bennett stipulated to a finding of dependency and the children were found to be dependent children.[1] Pursuant to a separate Judgment Entry filed the same day, the children were placed in the temporary custody of appellee SCDJFS.
 {¶ 6} A third amended complaint alleging that the children were dependent was filed on September 16, 2004. *Page 3 
 {¶ 7} Thereafter, on May 5, 2005, appellee SCDJFS filed a motion to extend temporary custody until December 17, 2005.
 {¶ 8} On July 19, 2005, appellee SCDJFS filed an amended motion to extend temporary custody to a motion for permanent custody. Appellee SCDFJS, in its motion, alleged that appellants' severe and chronic mental illness made them unable to provide an adequate permanent home for the children.
 {¶ 9} A hearing on the motion for permanent custody commenced on September 21, 2005. The following testimony was adduced at the hearing.
 {¶ 10} Anita Young, a social worker with appellee SCDJFS, testified that she was assigned to appellants' children as a case worker and that she had been involved with this case since July of 2004. Young testified that she created a case plan for appellants based on concerns about stable housing and appellants' mental health. Both appellants have mental health problems and collect social security disability for such problems. According to Young, the case plan required appellants to maintain stable and appropriate housing and to undergo psychological evaluations. Young testified that the psychological exams were ordered in June of 2004 and were to be performed by Northeast Ohio Behavioral Health and that, as of the dispositional hearing on September 7, 2004, had not been completed.
 {¶ 11} At the hearing, Young also testified that the next hearing was a six month review hearing held on December 5, 2004, and that the psychological evaluations, which were ordered by the court at the time of the Shelter Care hearing, had still not been completed even though she had conversations with appellants regarding the same in October and November of 2004. The psychological evaluations were finally *Page 4 
completed on December 14, 2004 at Melymbrosia. When asked whether appellants were able to complete the psychological evaluations at Northeast Ohio Behavioral Health, Young responded in the negative and testified that appellants told her that they were "very unhappy with that meeting with the psychologist." Transcript of September 21, 2005 hearing at 21. The following testimony was adduced when Young was asked whether appellants indicated why they were unhappy:
 {¶ 12} "A. Mrs. Bennett basically said that and I'll just put it . . . okay that she was unhappy with ah Doctor Tener because she stated that Doctor Tener said that she would lie to the Judge.
 {¶ 13} "Q. During the course of their meeting?
 {¶ 14} "A. Ah what do you mean?
 {¶ 15} "Q. As to what Doctor Tener is alleged to have said?
 {¶ 16} "A. As though Doctor Tener would have to. . . . this is how I understood it. That if there was a court hearing and Doctor Tener was at the court hearing that she would lie to the judge.
 {¶ 17} "Q. Okay and that was what Mrs. Bennett perceived Doctor Tener as having said?
 {¶ 18} "A. Yes ma'am." Transcript of September 21, 2005 at 21.
 {¶ 19} Young testified that, at a meeting held on October 14, 2004, appellants were given the opportunity to have their psychological evaluations performed at Melymbrosia instead. According to Young, as a result of appellants' evaluations, it was recommended that appellant Mary Bennett participate in on-going individual counseling for no less than one year and that she secure some type of part time employment. *Page 5 
Young also testified that family or group therapy also was recommended once appellants were stable. Young further testified that it was recommended that appellant Allah Bennett, who is bipolar, continue on medication and engage in individual counseling. The following testimony was adduced when Young was asked whether appellants had followed through with individual counseling:
 {¶ 20} "A. Both I believe started individual counseling in February of 2005. Mr. Bennett had been involved previously with ah ah Louis Stokes Veterans I can't remember that entire title of it . . . he had been involved with them for more years however I don't believe that he was involved with them as it relates to this particular ah incident. Um Mrs. Bennett um individually started her therapy in February with um Ms. Tara Schultz who was the case manager for Mr. Bennett. So she started individual therapy with her. However it really wasn't individual it was still between Mrs. Bennett and Mr. Bennett. Mr. Bennett was still sitting in on her therapy ah as late as April.
 {¶ 21} "Q. Are you aware if they are still continuing with Ms. Schultz today?
 {¶ 22} "A. Um to my knowledge no they are not and I . . . I was able to contact I can never pronounce his name he's the psychologist at the Veterans Association and he stated that Mr. Bennett's last.
 {¶ 23} "ATTY GRAHAM: Objection.
 {¶ 24} "THE COURT: Sustained.
 {¶ 25} "Q. They are not currently seeing Ms. Schultz correct?
 {¶ 26} "A. No they are not.
 {¶ 27} "Q. Okay. Are you aware if they are seeing any other counselor? *Page 6 
 {¶ 28} "A. Not to my knowledge. I did make a few telephone calls because when Nova was closed many of those clients were referred to three other Agency's (sic) that were taken on the ah the clients from Nova." Transcript of September 21, 2005 at 25-26.
 {¶ 29} When asked what aspects of the case plan appellants had not completed, Young responded that "I would just have to say that they have not established stability. Mental stability." Transcript of September 21, 2005 at 27. She further testified that she conveyed to appellants on numerous occasions that her job was to reunify the family and that she always tried to accommodate them. At the hearing, Young testified that appellants and their three children attended a mental health support group when the children were still living with appellants and that, once the children were removed from the home, Young continued transporting them to the support group meetings.
 {¶ 30} At the hearing, Young also testified that appellants and the three children had a family therapy session on April 4, 2005, with two therapists and that the next family therapy session did not take place until approximately June 6, 2005. When asked about the time lag between the two sessions, Young testified that appellant Mary Bennett got upset over something one of the therapists had said and it was decided that that the family therapy between appellants and their children needed to be in a therapeutic setting with a neutral third therapist.
 {¶ 31} Young testified at the hearing that the Magistrate ordered that the family therapy between appellants and their children was to be in a therapeutic setting with a neutral third therapist. The therapy occurred at Community Services. Young testified that appellants did not approve of the therapist at Community Services because she did *Page 7 
not have children. Young further testified that family therapy through Community Services was unsuccessful because there was a "huge disturbance" between appellants and their children at one of the sessions that upset appellants' two daughters and the therapist decided to suspend therapy until "which time the girl's therapist could recommend that they would be able to follow through with therapy." Transcript of September 21, 2005 hearing at 51.
 {¶ 32} According to Young, at a hearing in July of 2005, appellants agreed to be involved in family therapy through the Gentle Shepherd. However, Young testified that the Gentle Shepherd declined to provide services to appellants due to appellants' behavior. Appellants had made harassing telephone calls and left harassing and threatening voice mail messages for staff members at Gentle Shepherd and appellant Mary Bennett had threatened to sue Gentle Shepherd for allegedly violating HIPPA (Health Insurance Portability and Privacy Act).
 {¶ 33} The following testimony was adduced when Young was asked whether appellee SCDJFS had made reasonable efforts to assist appellants with reunification:
 {¶ 34} "Q. And what have those efforts been?
 {¶ 35} "A. Numerous efforts. If you want to consider the meetings alone the informal and the formal meetings alone it seems that the Bennett's would have they would have a disagreement with many of the provider's so it was . . . it was reported that they go to different providers at least on two occasions and just that alone I think that the Agency has shown that they're trying to accommodate and trying to reunify . . . if you also consider that this case went on for six months before the..the Bennett's addressed one of the primary court orders [the psychological evaluations] and the Agency at no *Page 8 
time during those six months filed a Motion to do anything. I think that the Agency has followed through with trying to provide the services as it relates to reunification. Yes ma'am.
 {¶ 36} "Q. Ms. Young do you believe that there is compelling reasons for the Court to grant permanent custody today?
 {¶ 37} "A. Yes ma'am." Transcript of September 21, 2005 hearing at 54-55.
 {¶ 38} Young also testified that appellants were more concerned with proving everyone else wrong rather than establishing and maintaining a healthy relationship with their children.
 {¶ 39} The next witness to testify at the permanent custody hearing was Dr. Steve Dean, a psychologist and licensed clinical counselor with Melymbrosia Associates who conducted a psychological evaluation of appellants. The evaluations were dated January 6, 2005. Dr. Dean testified that appellant Allah Bennett had serious chronic mental health issues that would always be present and that he was "suggestive of bipolar disorder" and had an unrealistic view of things. Transcript of September 21, 2005 hearing at 164. Dr. Dean testified that he recommended that appellant Allah Bennett regularly consult with a psychiatrist for monitoring of his medication and that he attend individual therapy. Dr. Dean further testified that he recommended that appellant establish stable housing and become financially secure and that Allah Bennett undergo a neurophysiologic psychological evaluation. Dr. Dean testified that he recommended that appellee SCDJFS maintain custody of the three children but that, if appellant complied with his case plan, "I felt that it would be appropriate to allow him to have his kids back . . ." Transcript of September 21, 2005 hearing at 174. *Page 9 
 {¶ 40} When questioned about appellant Mary Bennett, Dr. Dean testified that she reported multiple hospitalizations due to mental health problems. Testimony was adduced that appellant Mary Bennett has had mental health problems since the age of twenty-five and that appellant Allah Bennett has been hospitalized numerous times due to mental health problems.
 {¶ 41} Gail Mager, a professional clinical counselor with Northeast Ohio Behavioral Health who was the therapist for appellants' children, testified that she interacted with appellants during a joint family therapy session that was conducted at Nova with a therapist from Nova present. When asked if the session went well, Mager testified that "[i]t did not go well". Transcript of September 21, 2005 hearing at 197. Mager testified that when she expressed concerns over Josiah's behavior to appellant Mary Bennett, appellant Mary Bennett screamed at her. The following is an excerpt from Mager's testimony:
 {¶ 42} "Q. Let me back up a little bit. You were aware are you aware were you aware um that the visitation between the Bennett's and their children had been limited per court order to therapeutic visitation?
 {¶ 43} "A. Yes I am aware.
 {¶ 44} "Q. Okay. Um and then you issued a decision or made a recommendation regarding um continuation of even that contact correct?
 {¶ 45} "A. Correct.
 {¶ 46} "Q. What was . . . what was your recommendation?
 {¶ 47} "A. My recommendation after a meeting with the other therapist that the sessions had not gone well and that Mr. Bennett had allegedly threatened the oldest *Page 10 
daughter and I did not feel that it was appropriate for the kids to participate. I believe my statement was I cannot state now that it is not harmful for them to participate.
 {¶ 48} "Q. And how exactly Ms. Mager is that environment harmful?
 {¶ 49} "A. Children learn primarily how to behave from the examples that their parents provide. Parents are the first models for children and if he observes his parents cannot resolve differences and that there (sic) thoughts and disagreements is to lash out in anger then there is a high likelihood that he will respond the same way." Transcript of September 21, 2005 hearing at 203.
 {¶ 50} Mager testified that she recommended that joint family counseling be suspended because appellants' behavior was very traumatic for the children and did not benefit them.
 {¶ 51} Brianna Fracassi, a family case manager with the Ohio Youth Advocate Program, testified at the permanent custody hearing that, in June of 2005, she was employed by Community Services of Stark County as a family counselor. Fracassi testified that, in June of 2005, she had difficulty in obtaining an assessment of appellants due to strong emotion on appellants' part. She also testified that she was unable to establish rules during the first session with appellants because of appellants' behavior. Fracassi also testified that when appellants came in for their second session on June 13, 2005, she was unable to complete an assessment because appellants were unhappy that Maria and Gabriella had began to express themselves more and appellant Allah Bennett threatened to physically harm them. As a result, the session was ended. *Page 11 
 {¶ 52} At the hearing, Fracassi testified that communication was a big issue in this case and that appellants did not provide any support or validation to their children. She further testified that, at a counseling session held on July 6, 2005, appellant stood up and moved towards Maria in a threatening manner after he got upset because his daughters were expressing feelings. Appellant Allah Bennett, according to Francassi, said that "family counseling was not for expressing feelings." Transcript of February 7, 2006 hearing at 64-65. The following testimony was adduced when Fracassi was asked whether she ended the session then:
 {¶ 53} "A. We attempted to yes.
 {¶ 54} "Q. What do you mean when you say that you attempted to?
 {¶ 55} "A. We were the discussion I guess continued. Basically Mr. Bennett continued yelling. Mrs. Bennett started and continued that out into the lobby.
 {¶ 56} "Q. Okay. Did you have an opinion at that point in time as to whether or not continued family therapy would be beneficial?
 {¶ 57} "A. Yes.
 {¶ 58} "Q. And what was your opinion?
 {¶ 59} "A. That we were unable to continue family therapy.
 {¶ 60} "Q. And why did you come to that conclusion Ms. Fracassi?
 {¶ 61} "A. Especially in instances of where there is threatened physical harm its [sic] just not safe. It's not safe for children. It's not safe for their emotional health. It's just not appropriate." Transcript of February 7, 2006 hearing at 69.
 {¶ 62} Subsequently, pursuant to Findings of Fact and Conclusions of Law filed on June 21, 2006, the trial court found that the children could not be placed with either *Page 12 
parent within a reasonable period of time and should not be placed with their parents. The trial court, in its Findings of Fact and Conclusions of Law, stated, in relevant part, as follows:
 {¶ 63} "The court finds that the following the placement of the children outside the home and, not withstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the children to be placed outside the home, the parents have failed continuously and repeatedly to substantially remedy the conditions causing the children to be placed outside the home.
 {¶ 64} "The court further finds that the severe and chronic mental and emotional illness of each parent makes the parents unable to provide an adequate permanent home for the children at the present time and in the foreseeable future."
 {¶ 65} A best interest hearing then commenced on September 6, 2006. At the hearing, Anita Young testified that the three children, who ranged in age from 11 to 14 years of age, were biracial and had no developmental problems. The children had been in the custody of the agency since July of 2004. Young testified that Gabrielle has enlarged tonsils that cause her to have chronic infections and that it was recommenced that she have her tonsils out and that Maria has asthma. Young further testified that Josiah had behavioral problems in school relating to his socialization with other children. According to Young, Josiah did not get along with other children and picked on younger ones.
 {¶ 66} Young testified that both Maria and Gabrielle were residing with their first cousins, in the home of Becky Conn. Although Conn is not a relative of appellants, she cares for the children's first cousins. Young also testified that Josiah was in foster care *Page 13 
and had been residing with the Conns, but was removed due to behavioral problems. She further testified that Josiah was involved in ongoing counseling and that Maria had recently started going back to counseling. Young testified that she believed permanency was in the best interest of the children. At the hearing, Young further testified that Maria and Gabrielle appeared very comfortable in the Conn home and that their interaction with the Conns was normal. She further testified that she had never discussed adoption of the two girls with the Conns, but that "from the very beginning they were willing to help if they have to take placement of the children . . ." Transcript of September 6, 2006 hearing at 12. When questioned about Josiah's foster placement. Young testified that Josiah appeared to be comfortable there and interacted normally with his foster family.
 {¶ 67} Young testified that the two girls never asked about visiting with their parents while Josiah did. She testified that she believed adoption would benefit the children by establishing permanency in their lives and that it would be in their best interest for the court to grant permanent custody to appellee SCDJFS. The following testimony was adduced when she was asked why she believed that it was in their best interest:
 {¶ 68} "A. Because I think that we need to consider and I don't know that many people long to consider it how parents behavior have affected these children.
 {¶ 69} "Q. And what do you mean by that?
 {¶ 70} "A. When you think about it simply. You don't know what's going to happen next. You don't know whose house you're going to be over. You don't know um if you're going to be in shelter. Ah it has to affect children to a point where in this particular case which bothers me that they really don't even want to see their parents. *Page 14 
Um their life is not stable. Children deserve to have a stable loving environment in which to live. And I think that under the circumstances when you consider the lifestyle of Mr and Mrs Bennett because of whatever reasons they have not shown consistently that they addressed behaviors that cause these children to be ah in the custody of the Agency at this point. Ah they continue to display the same type of behavior that they began in the very beginning. And at no time at some point I think ah we need to consider our behavior and how our behavior affects the children. I don't believe that Mr and Mrs Bennett have considered that. For me this case has been about Mr and Mrs Bennett. Now I certainly don't want to focus in on them but this is how I look at it. You know. I look at it as if they both. . . . the children follow whatever reason whoever did it our first response should be to snap the children up and ask questions later. And I see it as Mr and Mrs Bennett have turned the other way in asking who did as opposed to snapping the children up out of the water and until they can demonstrate that their best interest is in the children and not in themselves I have concerns about the children and the risk of the children.
 {¶ 71} "Q. And what sort of risk do you believe that to be Anita?
 {¶ 72} "A. Not having a stable. . . . a risk can be. . . . you can say it can be neglect, abuse . . . if you're focused on so much of everything else and not on what's in the best interest of the children." Transcript of September 6, 2006 hearing at 22-23.
 {¶ 73} She further testified that she had observed the children upset due to their parents' behaviors. *Page 15 
 {¶ 74} On cross-examination, Young testified that Josiah said that he wanted to be with family. She further testified that Maria and Gabrielle did not have a bond with their parents, although Josiah did, and that the children were bonded.
 {¶ 75} At the best interest hearing, Gail Mager testified that the children were doing well in their current placements and that permanent custody would be in their best interest. On cross-examination, she testified that Josiah's behavior had improved significantly over the last two years and that he had been in his current placement for about a year and a half. Mager further testified that Josiah's foster family was not seeking to adopt him and that Josiah indicated to her that he wanted to be with his parents. Mager also testified on cross-examination that she still believed that it was in the children's best interest to have no contact with their parents and that the two girls had never indicated that they wanted to be returned to their parents.
 {¶ 76} The trial court filed Findings of Fact and Conclusions of Law as to Best Interest on November 22, 2006. As memorialized in a Judgment Entry filed on November 22, 2006, the trial court terminated appellants' parental rights and granted permanent custody of the three children to appellee SCDJFS.
 {¶ 77} Appellants now raise the following assignments of error on appeal:[2]
 {¶ 78} "I. THE TRIAL COURT'S FINDING THAT THE CHILDREN CANNOT BE PLACED WITH EITHER PARENT AT THIS TIME OR WITHIN A REASONABLE PERIOD OF TIME IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 79} "II. THE TRIAL COURT'S FINDING THAT IT IS IN THE CHILDREN'S BEST INTEREST THAT PERMANENT CUSTODY BE GRANTED TO THE STARK *Page 16 
COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 I {¶ 80} Appellants, in their first assignment of error, argue that the trial court's finding that the children cannot be placed with either parent at this time or within a reasonable period of time is against the manifest weight of the evidence. We disagree.
 {¶ 81} As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. Cross Truck v. Jeffries (Feb. 10, 1982), Stark App. No. CA-5758, 1982 WL 2911. Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Construction (1978),54 Ohio St.2d 279, 376 N .E.2d 578.
 {¶ 82} R.C. 2151.414(B)(1) states, "Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
 {¶ 83} "(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period *Page 17 
ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents . . ."
 {¶ 84} If the court determines, by clear and convincing evidence, that one or more of a list of sixteen situations exists, which are listed in R.C. 2151.414(E), then the court shall find that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. The first situation listed in the statute is:
 {¶ 85} "Following the placement of the child outside the home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. . . ." R.C.2151.414(E)(1).
 {¶ 86} In the case sub judice, the trial court found that the three children cannot and should not be placed with either parent within a reasonable time. The trial court also found that "following the placement of the children outside the home, and not withstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the children to be placed outside the home, the parents have failed continuously and repeatedly to substantially remedy the conditions causing the children to be placed outside the home."
 {¶ 87} In the case sub judice, the parties' case plan required them to complete psychological evaluations and to comply with recommended therapy to address concerns over their mental health. As is stated above, appellant Allah Bennett is bipolar *Page 18 
while appellant Mary Bennett had admitted to ongoing mental health problems since she was twenty-five. Both have been hospitalized for their mental health problems multiple times. Testimony was adduced at the hearing that appellants were initially referred to Northeast Ohio Behavioral Health for psychological evaluations but after they refused to cooperate, appellants were referred to Melymbrosia. The evaluations were not completed for a period of six months. Testimony also was adduced that appellants were terminated from family therapy at Community Services. As is stated above, Brianna Fracassi, who is employed by Community Services of Stark County as a family counselor, testified that family counseling sessions were terminated due to appellants' behaviors, which included physical threats, and the effect of the same upon the children. Gail Mager, the children's therapist, also testified that she recommended suspension of family counseling because of appellants' behavior.
 {¶ 88} Testimony also was adduced at the hearing that appellants then agreed to be assessed for family counseling by Gentle Shepherd Counseling Center. However, due to appellants' harassment of the staff at the center, Gentle Shepherd declined appellants as patients.
 {¶ 89} In short, based upon the record, we find that the trial court did not err in finding that the three children cannot and should not be placed with either parent within a reasonable time and that "following the placement of the children outside the home, and not withstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the children to be placed outside the home, the parents have failed continuously and repeatedly to substantially remedy the conditions causing the children to be placed outside the home." As noted by *Page 19 
appellee, the reunification process could have begun much more quickly had appellant obtained the court-ordered psychological evaluations in a more timely manner. Moreover, as noted by appellee, appellants' own actions resulted in at least three mental health care providers refusing to work with appellants and their children. From the record, it is apparent that appellants' own behavior resulted in their failure to comply with their case plan and that the agency made reasonable attempts to assist appellants in obtaining the needed therapy. It is further apparent from the testimony adduced at the hearing that, as noted by the trial court, "the severe and chronic mental and emotional illness of each parent makes the parents unable to provide an adequate permanent home for the children at the present time and in the foreseeable future."
 {¶ 90} Appellants' first assignment of error is, therefore, overruled.
 II {¶ 91} Appellants, in their second assignment of error, argue that the trial court's finding that it was in the children's best interest that permanent custody be granted to appellee SCDJFS was against the manifest weight of the evidence. We disagree.
 {¶ 92} In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the *Page 20 
child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.
 {¶ 93} In the case sub judice, testimony was presented at the best interest hearing that Maria and Gabrielle were doing well in their current placement with their cousins in the Conn home and that both had indicated that they did not want to return to appellants' home. There was testimony adduced at the best interest hearing that Maria and Gabrielle were not bonded to appellants. Young testified that although she had never discussed adoption of Gabrielle and Maria with the Conns, the Conns said that they were "willing to help if they have to take placement of the children we're willing to take these children in and take care of them." Transcript of September 6, 2006, hearing at 12. Testimony also was adduced that Josiah, who had expressed a desire to be reunited with his parents or with a family member, had been in the same foster home for over a year and was doing well and appeared to be happy. Moreover, testimony was adduced that his behavior had improved significantly while he was in foster care.
 {¶ 94} At the best interest hearing, Anita Young testified that all three children had been in therapy due to appellants' behavior and interactions with the children. Young also testified that the children needed stability in their lives and that no appropriate relatives had come forward requesting placement and/or custody. Young also testified that it was in the children's best interest for the court to grant permanent custody to appellee SCDJFS.
 {¶ 95} Gail Mager, the children's therapist, testified at the best interest hearing that she still believed that it was in the children's best interest to have no contact with their parents due to the mental health conditions of the parents and its negative effects *Page 21 
on the children. She opined that emotional harm would result if the children had contact with their parents. Mager testified that she was unaware of any changes in appellants' behavior since visitation between the children and appellants was suspended based, in part, on her recommendation. With respect to Maria and Gabrielle, Mager testified that continuation of their current stability was in their best interest. The Guardian Ad Litem, in her report, recommended that the children be placed in the permanent custody of appellee SCDJFS.[3]
 {¶ 96} Based on the foregoing, we find that the trial court's finding that it was in the children's best interest that permanent custody be granted to appellee SCDJFS was not against the manifest weight of the evidence. While appellants argue that a denial of permanent custody would not have created any further instability in the children's lives since they "are all in a situation that does not create permanence, control or stability", there is a chance the children will be adopted once permanent custody is granted. Furthermore, the testimony adduced at the hearing established that the children are faring well in their current situations and that contact with appellants would not be beneficial and may in fact, be harmful to them. There was testimony that neither parent had the emotional stability to provide for their children. *Page 22 
 {¶ 97} Appellants' second assignment of error is, therefore, overruled.
 {¶ 98} Accordingly, the judgment of the Stark County Court of Common Pleas, Juvenile Division is affirmed.
By: Edwards, J. Gwin, P.J. and Wise, J. concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Stark County Court of Common Pleas, Juvenile Division is affirmed. Costs assessed to appellants.
[1] Appellant Allah Bennett did not attend the September 7, 2004 adjudcation/dispositional hearing.
[2] On December 21, 2006, a Notice of Appeal was filed. The case was assigned No. 2006CA00379. On December 22, 2006, appellant Mary Bennett filed a Notice of Appeal. Such appeal was assigned Case No. 2006CA00383. The two cases were consolidated.
[3] The trial court, in its November 22, 2006, "Findings of Fact and Conclusions of Law as to Best Interests", also indicated that it had conducted an in-camera interview of all three children. We did not receive a transcript of that interview to review. *Page 1